```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___12/4/2019___
```

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**Employers Insurance Company of Wausau,**

                                        **Plaintiff,**

                        **-against-**

**Kingstone Insurance Company,**

                                        **Defendant.**

---

**1:17-cv-03970 (DAB) (SDA)**

**REPORT AND RECOMMENDATION**

**STEWART D. AARON, UNITED STATES MAGISTRATE JUDGE.**

**TO THE HONORABLE DEBORAH A. BATTS, UNITED STATES DISTRICT JUDGE:**

Before the Court is a motion by Plaintiff Employers Insurance of Wausau ("Plaintiff" or "Wausau"), pursuant to Fed. R. Civ. P. 56, for partial summary judgment seeking a declaration that Defendant Kingstone Insurance Company ("Defendant" or "Kingstone") owes a duty to defend in an underlying state court lawsuit and that Defendant's insurance coverage applies on a primary basis before coverage under Wausau's policy.[1] (Pl. Not. of Mot., ECF No. 34.) Also before the Court is a motion by Defendant, pursuant to Fed. R. Civ. P. 56, for summary judgment dismissing Plaintiff's Complaint in its entirety.[2] (Def. Not. of Mot., ECF No. 40.)

---

[1] In connection with Plaintiff's partial summary judgment motion, the Court has considered Plaintiff's memorandum of law (Pl. PMSJ Mem., ECF No. 36); Plaintiff's 56.1 Statement (Pl. 56.1, ECF No. 37); Plaintiff's moving Declaration, together with its exhibits (Potashner PMSJ Decl., ECF No. 35); Defendant's opposition memorandum of law (Def. Opp. Mem., ECF No. 45); Defendant's Counter 56.1 (Def. Counter 56.1, ECF No. 44); Defendant's opposing Declaration, together with its exhibits (McCauley Opp. Decl., ECF No. 46); Plaintiff's reply memorandum of law (Pl. Reply, ECF No. 47); and Plaintiff's reply Declaration, together with its exhibits. (Potashner Reply Decl., ECF No. 48.)

[2] In connection with Defendant's summary judgment motion, the Court has considered Defendant's memorandum of law (Def. MSJ Mem., ECF No. 41); Defendant's 56.1 Statement (Def. 56.1, ECF No. 43); Defendant's moving Declaration, together with its exhibits (McCauley MSJ Decl., ECF No. 42); Plaintiff's opposition memorandum of law (Pl. Opp. Mem., ECF No. 52); Plaintiff's Counter 56.1 (Pl. Counter 56.1, ECF No. 50); Plaintiff's opposing Declaration, together with its exhibits (Potashner Opp. Decl., ECF No. 51);

For the reasons set forth below, I respectfully recommend that Plaintiff's motion for partial summary judgment be GRANTED and that Defendant's motion for summary judgment be DENIED.

## RELEVANT FACTS COVERED BY 56.1 STATEMENTS

### I.      The Underlying Action

On or about June 16, 2015, James Nunziato ("Nunziato'") commenced the action entitled *James Nunziato v. The Port Authority of New York and New Jersey, Bombardier Transportation (Holdings) USA Inc. and Capital Cleaning Contractors, Inc. of New York*, Index No. 23303/2015E, which is pending in the Supreme Court of the State of New York, County of Bronx (the "Underlying Action"). (Pl. 56.1 ¶ 1; Def. Counter 56.1 ¶ 1; Def. 56.1 ¶ 1; Pl. Counter 56.1 ¶ 1.) Port Authority of New York and New Jersey ("PANYNJ"), Capital Cleaning Contractors, Inc., of New York ("Capital Cleaning") and Bombardier Transportation (Holdings) USA Inc. ("Bombardier") are defendants in the Underlying Action. (Pl. 56.1 ¶ 2; Def. Counter 56.1 ¶ 2.) In the Underlying Action, Nunziato alleges that he slipped and fell on the platform of the walkway of the AirTrain Station at Terminal One of JFK International Airport, located in Jamaica, New York, on July 14, 2014, and sustained bodily injuries. (Pl. 56.1 ¶ 3; Def. Counter 56.1 ¶ 3; Def. 56.1 ¶ 2; Pl. Counter 56.1 ¶ 2.)

In the Underlying Action, in his initial Complaint and Amended Complaint, Nunziato alleges that PANYNJ "owned" and "operated" the premises located at the AirTrain Station (Potashner PMSJ Decl., Ex. 8, Verified Compl. ¶¶ 11-12; McCauley MSJ Decl., Ex. L, Am. Verified Compl., ¶ 11-12); that Bombardier was contracted to "provide security and surveillance services,"

---

Defendant's reply memorandum of law (Def. Reply, ECF No. 53); and Defendant's reply Declaration. (McCauley Reply Decl., ECF No. 54.)

"provide cleaning and maintenance services" and "operate a public transportation station" at the AirTrain station (Verified Compl. ¶¶ 13-15; Am. Verified Compl. ¶ 13-15); and that Capital Cleaning was contracted to "provide cleaning and maintenance services" and "operate a public transportation station" at the AirTrain station. (Verified Compl. ¶¶ 16-17; Am. Verified Compl. ¶¶ 16-17.)

In Nunziato's Amended Complaint in the Underlying Action, he added North Mountain Contractor's Inc. ("North Mountain") as a defendant. (Pl. 56.1 ¶ 7; Def. Counter 56.1 ¶ 7; Def. 56.1 ¶ 3; Pl. Counter 56.1 ¶ 3.) He alleges that North Mountain was contracted to "provide cleaning and maintenance services" and "operate a public transportation station" at the AirTrain station. (Am. Verified Compl. ¶¶ 18-19.) On or about November 26, 2016, a default judgment was entered against North Mountain by PANYNJ, Bombardier and Capital Cleaning on their cross-claims for indemnification. (Pl. 56.1 ¶ 10; Def. Counter 56.1 ¶ 10.)

The Verified Bill of Particulars in the Underlying Action states that "the incident occurred while the plaintiff was exiting the Airtrain and was caused to slip and fall as a result of a wet, slippery, hazardous condition on the platform." (Pl. 56.1 ¶ 8; Def. Counter 56.1 ¶ 8.) Nunziato alleged in the Underlying Action that the incident "was caused solely and wholly by reason of the carelessness and negligence of the defendants, their officers, agents, servants and/or employees." (Verified Compl. ¶ 30; Am. Verified Compl. ¶ 35.)

## II.   Relevant Agreements

On or about September 1, 2013, Bombardier entered into a Services Agreement with Capital Cleaning. (Pl. 56.1 ¶ 12; Def. Counter 56.1 ¶ 12.) Pursuant to the Services Agreement, Capital Cleaning agreed to "maintain the JFK AirTrain System . . . to a high level of cleanliness;"

basically, Capital Cleaning agreed to provide janitorial service for the AirTrain Stations at JFK airport. (Pl. 56.1 ¶ 13; Def. Counter 56.1 ¶ 13.)

By Independent Contractor Agreement (the "North Mountain Agreement"), dated February 20, 2013, Capital Cleaning engaged North Mountain to perform janitorial service/floor maintenance services. (Pl. 56.1 ¶ 14; Def. Counter 56.1 ¶ 14; Def. 56.1 ¶ 4; Pl. Counter 56.1 ¶ 4.) Pursuant to the North Mountain Agreement, North Mountain agreed to "provide the day to day management and services" and to "[furnish] at their expense all supervision, labor, equipment, materials, and supplies to provide the services and [to] maintain all equipment in satisfactory condition and safe working order." (Pl. 56.1 ¶ 16; Def. Counter 56.1 ¶ 16.) The North Mountain Agreement provides, in part, as follows:

a) Independent Contractor [North Mountain] shall pay [sic], at his/her expense, carry adequate insurance as set forth herein to fully protect Independent Contractor, Capital and the project owner from any and all claims of any nature for damage to property and for personal injury, including death, which may arise from the performance of this contract. Such policy, at Capital's option, may be subject to the prior approval of Capital. All policies must name Capital and the project owner as an additional insured. Said policy shall contain a provision that it may not be cancelled or materially changed by Independent Contractor without thirty (30) days written notice to Capital.

b) During the term of this Agreement, Contractor shall, at its own expense, provide and maintain in full force and effect, "occurrence" based form insurance of the type, kind and amount hereinafter specified:

i. Comprehensive General Liability insurance for a combined bodily injury, property damage, and personal injury limit of at least $1,000,000 per occurrence. The policy shall contain all endorsements of Insurance Services Office (ISO) — 1994 Form including but not limited to explosion, collapse, underground hazard, independent contractors, hazard fire damage, blanket contractual and expanded personal injury coverage.

* * *

4

c) Certificates of insurance must be supplied by Independent Contractor prior to the commencement of work. Said certificate must be signed by an authorized representative of the insurance carrier or producer, indicating the Additional Insured's and Named Insured's as required herein, and expressly reference the inclusion of all required endorsements, including liability and worker's compensation insurance. Upon expiration of the policy, or change in coverage, Independent Contractor shall immediately supply a Certificate of Insurance verifying coverage in accordance with the terms of this Agreement. Independent ***Contractors are responsible to be in compliance with insurance requirements in all States in which they perform work under this Agreement***.

(Pl. 56.1 ¶ 17; Def. Counter 56.1 ¶ 17 (emphasis in original).)

### III.   **Kingstone Policy**

Kingstone issued a Crafts/12K Pak insurance policy, No. CP 5011704, with a policy period from March 26, 2014 to March 26, 2015, to North Mountain as the Named Insured (the "Kingstone Policy"). (Pl. 56.1 ¶ 18; Def. Counter 56.1 ¶ 18.) The Kingstone Policy was issued on March 27, 2014. (Pl. 56.1 ¶ 19; Def. Counter 56.1 ¶ 19.) The Kingstone Policy has an Each Occurrence Limit of $1 million. (Pl. 56.1 ¶ 20; Def. Counter 56.1 ¶ 20.)

The General Liability Coverage Manufacturers' and Contractors Liability Insurance Agreement, which is part of the Kingstone Policy, contains a liability insuring agreement that provides, in relevant part, as follows:

**WHAT *WE* PAY FOR**

*We* pay, up to the limit of liability, all sums when the insured is legally obligated to pay damages because of *bodily injury* and/or *property damage* caused by an *occurrence* to which the coverage applies. . . . *We* shall have the right and duty to defend the *insured* against any *suit* seeking covered damages, even if any of the allegations of the suit are groundless, false or fraudulent, provided the suit seeking covered damages originates from *bodily injury* and/ or *property damage* not otherwise excluded.

(Pl. 56.1 ¶ 21; Def. Counter 56.1 ¶ 21 (emphasis in original).)

The Kingstone Policy contains an endorsement entitled "ADDITIONAL INSURED — CONTRACTUAL OBLIGATION (CONTRACTORS)," which provides as follows:

DEFINITION

The definition of *insured* in the General Liability Coverage is amended to include any person(s) or organization(s) for whom you are performing operations under contract and for **whom *you* are contractually obligated to furnish additional *insured* coverage.**

This endorsement covers only liability arising out of *your* work involving ongoing operations performed for the additional *insured(s)* and is limited to vicarious liability arising from the hazards covered by this policy. We do not provide coverage for any liability arising out of any acts or omissions of any additional *insured(s)*, their employees or any other person or organization with which the additional *insured(s)* has/have a contract or other relationship. Coverage under this endorsement ceases on expiration of the policy or on completion of *your* operations for that *insured*.

(Pl. 56.1 ¶ 22; Def. Counter 56.1 ¶ 22 (emphasis in original).)

The Kingstone Policy contains an "Other Insurance" provision that provides, in part, as follows:

7. Insurance Under More Than One Policy

a. Insurance under this General Liability Coverage is primary except [as] provided under paragraph 7c below, or unless otherwise stated in this policy. The amount of *our* liability is not reduced because of other insurance which applies to the loss on an excess basis.

* * *

c. Insurance under this General Liability Coverage is excess over any other insurance:

1. if the other insurance, whether primary, excess, contingent or on any other basis, provides:

a. fire, extended coverage, builders' risk, installation risk or similar coverage for *your work*; or

b. fire insurance for premises rented to *you*; or

>   2. if the other insurance applies to any loss arising out of the maintenance
>   of use of aircraft, *autos* or watercraft which may be covered by this policy.

(Pl. 56.1 ¶ 23; Def. Counter 56.1 ¶ 23 (emphasis in original).)

Kingstone's Crafts/12 PAK Guidelines provides, in part, as follows:

**IMPORTANT NOTE**

**IF A CLAIM OCCURS AS A RESULT OF THE NAMED INSURED WORKING OUTSIDE THE POLICY DESIGNATED CLASSIFICATION, THE POLICY MAY BE CANCELLED AND OR VOIDED. IF WE ARE MADE AWARE OF ADDITIONAL EMPLOYEE'S [sic] OR ADDITIONAL CLASSIFICATIONS WE CAN MAKE THE NECESSARY CHANGES TO THE INSURANCE POLICY THAT WE DEEM NECESSARY.**

(Pl. 56.1 ¶ 40; Def. Counter 56.1 ¶ 40 (emphasis in original).)[3]

**IV.   Wausau Policy**

Wausau issued Commercial General Liability policy, No. TBC-291-461216-023, with a policy period from July 21, 2013 to July 21, 2014, to Capital Contractors, Inc., as the first Named Insured (the "Wausau Policy"). (Pl. 56.1 ¶ 25; Def. Counter 56.1 ¶ 25.) Capital Cleaning is listed as a Named Insured on the Wausau Policy. (Pl. 56.1 ¶ 26; Def. Counter 56.1 ¶ 26.) With respect to Named Insureds, the Wausau Policy contains an "Other Insurance" that provides, in part, as follows:

**b. Excess Insurance**

(1)  This insurance is excess over:

* * *

(b) Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and complete operations, for which you have been added as an additional insured by attachment of an endorsement.

---

[3] The Kingstone Policy also contains a contractual liability exclusion (*see* Discussion Section II.A., *infra*), but such exclusion was not addressed in any of the 56.1 statements submitted to the Court.

(Pl. 56.1 ¶ 28; Def. Counter 56.1 ¶ 28.)

The Wausau Policy, for additional insureds, contains an "Other Insurance" provision that provides, in part, as follows:

> This insurance shall be excess over any other insurance available to the additional insured, whether such insurance is on an excess, contingent or primary basis, unless you are obligated under a written agreement to provide liability insurance for that additional insured on any other basis. In that event, this policy will apply solely on the basis required by such written agreement.

(Pl. 56.1 ¶ 29; Def. Counter 56.1 ¶ 29.)

**V.**     **Relevant Correspondence**

By letter dated June 2, 2015 addressed to North Mountain, but with a copy sent to D'Angelo Insurance Agency ("D'Angelo"),[4] Wausau provided notice of the accident alleged in the Underlying Action to Kingstone. (Pl. 56.1 ¶ 31; Def. Counter 56.1 ¶ 31.) The June 2, 2015 letter was forwarded to Kingstone. (Pl. 56.1 ¶ 32; Def. Counter 56.1 ¶ 32.) By letter dated June 30, 2015, addressed to North Mountain, but with a copy to D'Angelo, Wausau again tendered the claim to Kingstone. (Pl. 56.1 ¶ 33; Def. Counter 56.1 ¶ 33.) By letter dated August 10, 2015, counsel for Capital Cleaning tendered the Summons and Complaint for the Underlying Action to Kingstone. (Pl. 56.1 ¶ 34; Def. Counter 56.1 ¶ 34.) By letter dated August 19, 2015, Kingstone disclaimed coverage for PANYNJ, Bombardier and Capital Cleaning for the Underlying Action, stating, in relevant part, as follows:

---

[4] One of Kingstone's 30(b)(6) witnesses, Walden, testified at deposition that D'Angelo was "[s]ubproducer or independent agent" of Kingstone, or "basically the agent of [Kingstone's] agent." (*See* Potashner PMSJ Decl., Ex. 14, at 69.)

**COVERAGE DETERMINATION**

Based upon the policy language, endorsements and the details of this loss, **we must respectfully advise that there is no coverage for this matter under the Kingstone Insurance Company policy**.

*This is due to the specific exclusions in the policy, referenced within/for matters involving a misrepresentation of any material fact or circumstance concerning this insurance. Additionally, there is no coverage for matters involving liability assumed in a contract and/or any obligation to which North Mountain Contracting; Incorporated becomes liable to indemnify, defend or contribute because of bodily injury. Breach of Contract and/or Failure to Procure Insurance are not covered claims in that they do not fall within the definition of bodily injury, property damage or an occurrence. Therefore, there is no coverage available under the Kingstone Insurance Company policy for any of claims associated with this loss.*

**Kingstone Insurance Company will not defend and/or indemnify North Mountain Contracting Incorporated, Capital Contractors, Incorporated, Bombardier Transportation (Holdings) USA, Incorporated and/or The Port Authority of New York and New Jersey in this matter.**

(Pl. 56.1 ¶ 35; Def. Counter 56.1 ¶ 35 (emphasis in original); *see also* Def. 56.1 ¶ 6; Pl. Counter 56.1 ¶ 6.)

By letter dated September 16, 2016, Capital Cleaning's counsel tendered the Supplemental Summons and Amended Verified Complaint to Kingstone. (Pl. 56.1 ¶ 37; Def. Counter 56.1 ¶ 37.) Kingstone maintained its disclaimer. (Pl. 56.1 ¶ 38; Def. Counter 56.1 ¶ 38.) Kingstone has not rescinded the Kingstone Policy. (Pl. 56.1 ¶ 39; Def. Counter 56.1 ¶ 39; Def. 56.1 ¶ 7; Pl. Counter 56.1 ¶ 7.)

### OTHER FACTS PROFERRED BY
### DEFENDANT BUT NOT INCLUDED IN 56.1 STATEMENTS

In its memorandum of law submitted in support of its motion for summary judgment, Defendant alleges certain facts that are not contained in either of its 56.1 statements, and it does so without citation to the record. The Court sets forth those facts below (including the headings used by Defendant in its summary judgment memorandum). The Court includes in the block

quotations in brackets citations to exhibits submitted by Defendant that appear to be the basis

for Defendant's allegations.

I.      **[North Mountain Insurance] Application [To Kingstone] And Underwriting**

The following allegations are contained on pages 7 and 8 of Defendant's summary

judgment memorandum:

> A commercial insurance application, dated March 26, 2014, was completed by
> independent agent, D'Angelo Insurance Agency, and executed by Kent Carmargo
> on behalf of North Mountain. [McCauley MSJ Decl., Ex. Q, ECF No. 42-17.] In the
> premises information section, the application states that there is one full-time
> employee, and no part-time employees. [*Id*. at 3.] In the Schedule of Hazards, the
> application states "Janitorial", with a Class Code 96816, and gross sales of $50,000.
> [*Id*. at 6.]

> On April 17, 2018,[5] Mueller Insurance Services, on behalf of Kingstone,
> conducted a telephone interview with Kent Carmargo in connection with North
> Mountain's insurance application. [McCauley MSJ Decl., Ex. P, ECF No. 42-16.]
> According to the clarifying comments of the survey, North Mountain had one (1)
> owner and no employees. [*Id*. at 4.]

(Def. MSJ Mem. at 7-8.)

II.     **Kingstone's Claims Investigation**

The following allegations are contained on page 7 of Defendant's summary judgment

memorandum:

> Kingstone's investigation of the underlying loss [in August 2015] revealed that
> North Mountain had twenty-five (25) employees that worked twenty-four (24)
> hours a day at JFK airport. Their duties included cleaning the Jamaica New York
> Long Island Train Station, and also cleaning and maintaining nine (9) Air Train
> Stations which service the JFK Airport. This work was done in three (3) shifts with
> five (5) employees working per shift. Capital Cleaning was North Mountain's only
> client and it had no other business. [McCauley MSJ Decl., Ex. O, ECF No. 42-15.]

---

[5] This date used by Defendant in its summary judgment memorandum is a typographical error. The actual
date is April 17, 2014. (*See* McCauley MSJ Decl., Ex. P, ECF No. 42-16.)

(Def. MSJ Mem. at 7.)[6]

## LEGAL STANDARDS

### I.      Summary Judgment Standard

Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-50 (1986). The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 321-23 (1986). A dispute concerning material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir. 1992) (quoting *Anderson*, 477 U.S. at 248). In making its determination, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Anderson*, 477 U.S. at 255.

"Federal and state courts in New York have recognized that determination of an insurer's duty to defend presents a question of law appropriate for resolution by summary judgment." *Wausau Underwriters Ins. Co. v. QBE Ins. Corp.*, 496 F. Supp. 2d 357, 360 (S.D.N.Y. 2007), *opinion clarified*, 533 F. Supp. 2d 389 (S.D.N.Y. 2008) (citations omitted).

### II.      Duty To Defend

The parties agree that New York law governs their dispute. The duty to defend under New York law has been described by the Second Circuit in the summary judgment context, as follows:

> An insurer's duty to defend claims made against its policyholder is ordinarily ascertained by comparing the allegations of a complaint with the wording of the insurance contract. . . . "[T]he initial interpretation of a contract is a matter of law

---

[6] Defendant also includes in its summary judgment memorandum a portion of its underwriting guidelines, as well as citations to deposition testimony regarding underwriting. (*See* Def. MSJ Mem. at 8-9.)

for the courts to decide," . . ., and if the wording on the duty to defend is clear and unambiguous, it will be enforced according to its terms. The goal is always to give effect to the intent of the parties, as embodied in their written agreement. . . . In reading the text, a potent background principle is that the duty to defend is broader than the duty to indemnify. . . . The duty is to defend any action, regardless of its merit, that seeks damages *potentially* within the indemnity coverage. . . .

At the same time, an insurer's duty to defend is limited absolutely by the scope of the coverage purchased. . . . If there is no legal or factual circumstance that could trigger the duty to indemnify against a claim, then there is no duty to defend against it. . . . Furthermore, an insurer may withdraw from an ongoing defense if it becomes clear that the claim is wholly outside the indemnification agreement. Any ambiguity as to the insurer's duty to defend is resolved in favor of the insured. . . .

. . .

As noted *supra*, the general rule in determining whether an insurer has a duty to defend is to compare the allegations of the complaint with the operative insurance policy. . . . A narrow, but widely recognized exception to the rule allows an insurer to refuse or withdraw a defense if evidence extrinsic to those sources and "unrelated to the merits of plaintiff's action[,] plainly take the case outside the policy coverage." . . . [H]owever, where the evidence offered does not allow a court to "*eliminate the possibility* that the insured's conduct falls within coverage of the policy," the insurer is not relieved of its duty to defend.

*Int'l Bus. Machines Corp. v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 144, 148 (2d Cir. 2004) (emphasis in original) (citations and footnotes omitted). Thus, while in general, the interpretation of an ambiguous term requires the Court or a jury to consider extrinsic evidence, those steps are unnecessary when the issue is the insurer's duty to defend, since "[a]ny ambiguity as to the insurer's duty to defend is resolved in favor of the insured." *Int'l Bus. Mach. Corp.*, 363 F.3d at 144.

"If, liberally construed, the claim is within the embrace of the policy, the insurer must come forward to defend its insured no matter how groundless, false or baseless the suit may be."

*Century 21, Inc. v. Diamond State Ins. Co.*, 442 F.3d 79, 83 (2d Cir. 2006) (citation omitted). "If any of the claims against [an] insured arguably arise from covered events, the insurer is required to defend the entire action." *Town of Massena v. Healthcare Underwriters Mut. Ins. Co.*, 98 N.Y.2d 435, 443 (2002) (citation omitted). The "standard for determining whether an additional insured is entitled to a defense is the same standard that is used to determine if a named insured is entitled to a defense." *BP Air Conditioning Corp. v. One Beacon Ins. Group*, 8 N.Y.3d 708, 715 (2007).

Finally, "an insurer can be relieved of its duty to defend if it establishes as a matter of law that there is no possible factual or legal basis on which it might eventually be obligated to indemnify its insured under any policy provision." *Allstate Ins. Co. v. Zuk*, 78 N.Y.2d 41, 45 (1991).

## III.   Priority Of Coverage

"In insurance contracts the term 'other insurance' describes a situation where two or more insurance policies cover the same risk in the name of, or for the benefit of, the same person." *Great N. Ins. Co. v. Mount Vernon Fire Ins. Co.*, 92 N.Y.2d 682, 686-87 (1999). "Excess coverage" refers to insurance that "'kicks in' to provide additional coverage once the policy limits of other available insurance are exhausted." *Inst. for Shipboard Educ. v. Cigna Worldwide Ins. Co.*, 22 F.3d 414, 419 (2d Cir. 1994) (citation omitted). A primary policy generally "must pay out its entire limit first, followed by policies that were intended to be excess." *Certain Underwriters v. Illinois Nat. Ins. Co.*, 99 F. Supp. 3d 400, 404 (S.D.N.Y. 2015).

When a particular claim is covered by two or more insurance policies, courts look to the "other insurance" clauses of those policies to apportion coverage between the relevant insurance

carriers. *See Sport Rock Int'l, Inc. v. Am. Cas. Co. of Reading, PA*, 65 A.D.3d 12, 17 (1st Dep't 2009)

(citing *Great N. Ins. Co.*, 92 N.Y.2d at 686-87).

**IV.    Policy Exclusions**

"[W]henever an insurer wishes to exclude certain coverage from its policy obligations, it

must do so 'in clear and unmistakable' language." *Seaboard Sur. Co. v. Gillette Co.*, 64 N.Y.2d 304,

311 (1984) (citations omitted). "Any such exclusions or exceptions from policy coverage must be

specific and clear in order to be enforced. They are not to be extended by interpretation or

implication, but are to be accorded a strict and narrow construction." *Id*. (citations omitted).

"Indeed, before an insurance company is permitted to avoid policy coverage, it must satisfy the

burden which it bears of establishing that the exclusions or exemptions apply in the particular

case . . ., and that they are subject to no other reasonable interpretation." *Id*. (citations omitted).

"To be relieved of its duty to defend on the basis of a policy exclusion, the insurer bears

the heavy burden of demonstrating that the allegations of the complaint cast the pleadings

wholly within that exclusion, that the exclusion is subject to no other reasonable interpretation,

and that there is no possible factual or legal basis upon which the insurer may eventually be held

obligated to indemnify the insured under any policy provision." *Frontier Insulation Contractors,*

*Inc. v. Merchants Mut. Ins. Co*., 91 N.Y.2d 169, 175 (1997).

**V.    Standards For Rescission Of Insurance Policy**

"Under New York law, an insurer may rescind an insurance policy that was issued in

reliance upon material misrepresentations." *Chicago Ins. Co. v. Kreitzer & Vogelman*, No. 97-CV-

08619, 2000 WL 16949, at *5 (S.D.N.Y. 2000) (citing *Republic Ins. Co. v. Masters, Mates & Pilots*

*Pension Plan*, 77 F.3d 48, 52 (2d Cir. 1996); *Aetna Cas. & Surety Co. v. Retail Local 906*, 921 F.

Supp. 122, 131 (E.D.N.Y. 1996), *aff'd*, 106 F.3d 34 (2d Cir. 1997)). "Such a policy is considered void *ab initio*, and all obligations under a rescinded policy are therefore extinguished." *Kreitzer & Vogelman*, 2000 WL 16949 at *5 (internal citations omitted).

"The insurer bears the burden of establishing both that there has been a misrepresentation and that the misrepresentation was material." *Id*. (citing *Home Ins. Co. of Ill. v. Spectrum Info. Techs*., 930 F. Supp. 825, 835 (E.D.N.Y. 1996); *Retail Local 906*, 921 F. Supp. at 131)); *see also Landmark Am. Ins. Co. v. S & S Pub*., No. 10-CV-02982, 2011 WL 5825143, at *3 (E.D.N.Y. Nov. 14, 2011) (noting that "[a]s to rescission, the insurer bears the burden of proving the making of a misrepresentation and that the insurer's knowledge of that misrepresentation would have resulted in the insurer's refusal to issue [the] policy in the first place") (citing *Vella v. Equitable Life Assurance Soc*., 887 F.2d 388, 391 (2d Cir. 1989)).

"Section 3105(a) of New York's Insurance Law defines 'misrepresentation' as a false 'statement as to past or present fact, made to the insurer by . . . the applicant for insurance or the prospective insured, at or before the making of the insurance contract as an inducement to the making thereof.'" *Kreitzer & Vogelman*, 2000 WL 16949, at *6. "The concept of misrepresentation encompasses both false affirmative statements and the failure to disclose where a duty to disclose exists." *Id*. "While generally an 'applicant for insurance is under no duty to volunteer information where no question plainly and directly requires it to be furnished,' [*Vella*, 887 F.2d at 392], an applicant is required to provide truthful and comprehensive answers to the questions asked in connection with his or her insurance application(s), and fraudulent concealment may at times void an insurance policy even where the fact concealed was not

inquired into by the insurer. *See Retail Local 906*, 921 F. Supp. at 132." *Kreitzer & Vogelman,* 2000 WL 16949, at *6.

"Section 3105(b) of New York's Insurance Law provides that a misrepresentation is material if 'knowledge by the insurer of the facts misrepresented would have led to a refusal by the insurer' to make the contract." *Kreitzer & Vogelman*, 2000 WL 16949 at *6. "Materiality is measured by whether the insurer was induced by the insured's statements 'to issue a policy that it would not have otherwise issued.'" *Guard Ins. Grp. v. Reliable Ins. Servs., LLC*, No. 15-CV-02949, 2016 WL 542131, at *3 (E.D.N.Y. Feb. 9, 2016) (quoting *Landmark Am. Ins. Co*., 2011 WL 5825143, at *3). "Courts have expanded this statutory definition of materiality somewhat to allow an insurance company to 'avoid liability on the policy by showing that had it known the truth it would not have issued the exact same policy it did issue.'" *Kreitzer & Vogelman*, 2000 WL 16949 at *6 (quoting *Vella*, 887 F.2d at 391). In this regard, "'[t]he question . . . is not whether the company might have issued the policy even if the information had been furnished; the question in each case is whether the company has been induced to accept an application that it might otherwise have refused.'" *Mutual Benefit Life Ins. Co. v. JMR Elecs. Corp*., 848 F.2d 30, 32 (2d Cir. 1988) (quoting *Geer v. Union Mut. Life Ins. Co*., 273 N.Y. 261, 269 (1937)).

"In deciding the question of materiality, a court must consider whether the alleged misrepresentations were material at the time the contract was entered into . . . based on, *inter alia*: Evidence of the insurer's practice with respect to similar risks, as shown by such documents as the insurer's underwriting manuals or rules, and by testimony of a qualified employee of the insurer that the insurer would not have issued the particular contract it did had the facts been disclosed." *Kreitzer & Vogelman*, 2000 WL 16949, at *7 (citations omitted). "The question of

materiality is typically one of fact for resolution at trial, but 'where the evidence concerning the materiality is clear and substantially uncontradicted, the matter is one of law for the court to determine.'" *Id*. at \*7 (quoting *Process Plants Corp. v. Beneficial Nat'l Life Ins. Co.*, 53 A.D.2d 214, 216 (1st Dep't 1976), *aff'd*, 42 N.Y.2d 928 (1977)).

## DISCUSSION

The Court first will address Plaintiff's motion for partial summary judgment and then will address Defendant's motion for summary judgment.

### I.   **Plaintiff's Motion For Partial Summary Judgment**

On its partial summary judgment motion, Wausau seeks a declaration that (1) Kingstone owed a duty to defend PANYNJ, Capital Cleaning and Bombardier in the Underlying Action, and (2) Kingstone's insurance coverage applies on a primary basis before coverage under Wausau's policy. (*See* Pl. PMSJ Mem. at 14-18, 21-23.) The duty to defend and priority of coverage issues are discussed separately.

#### A.   **Duty To Defend**

In order for Defendant to owe a duty to defend PANYNJ, Capital Cleaning and Bombardier, those entities must qualify as additional insureds under the Kingstone Policy. As set forth in the Kingstone Policy, PANYNJ, Capital Cleaning and Bombardier qualify as additional insureds pursuant to the term of the Kingstone Policy if (1) North Mountain was "contractually obligated" to include them as additional insureds; (2) North Mountain was "performing operations" for them "under contract;" and (3) the Underlying Action alleges a claim for "vicarious liability." (*See* Pl. 56.1 ¶ 22; Def. Counter 56.1 ¶ 22.)

With respect to the first element, pursuant to the North Mountain Agreement, North Mountain was contractually obligated to "name Capital [Cleaning] and the project owner as an additional insured." (*See* Pl. 56.1 ¶ 17; Def. Counter 56.1 ¶ 17.) The first element clearly is satisfied as to Capital Cleaning, since it is mentioned by name in the North Mountain Agreement. It also is satisfied as to PANYNJ, since the Complaint and Amended Complaint in the Underlying Action allege that PANYNJ "owned" the premises located at the AirTrain Station, where the injury occurred. (Verified Compl. ¶¶ 11-12; Am. Verified Compl. ¶ 11-12.) Moreover, Defendant does not dispute that North Mountain was contractually obligated to name PANYNJ as an additional insured. (*See* Def. Opp. Mem. at 5.)

Defendant, however, does dispute that North Mountain had a contractual requirement to name Bombardier as an additional insured under the North Mountain Agreement, since Bombardier was not the "project owner." (*See id*.) Therefore, the question before the Court is whether Bombardier was "project owner" as that term is used in the North Mountain Agreement.

The term "project owner" is not defined in the North Mountain Agreement. However, Paragraph 1 of the North Mountain Agreement refers to the "project," as follows:

> [North Mountain] agrees to perform any and all services generally performed by [North Mountain] in [its] usual line of business (or required or requested by Capital or necessary for the completion of the **project** according to the plans and specifications attached hereto), including but not limited to, the following: General cleaning i.e. Dusting, vacuuming, sweeping, general lavatory cleaning, facilities services, snow removal etc.

(Potashner PMSJ Decl., Ex. 6, ¶ 1 (emphasis supplied).)[7] Thus, in the context of the North Mountain Agreement, the "project" was the cleaning of the AirTrain station. According to the

---

[7] The North Mountain Agreement draws a distinction between the "project" and the "premises." Paragraph 12 of the North Mountain Agreement states that "[t]he services to be performed hereunder

Complaint and Amended Complaint in the Underlying Action, Bombardier was contracted to "operate" and "provide cleaning and maintenance services" at the AirTrain station. (*See* Verified Compl. ¶¶ 13-15; Am. Verified Compl. ¶ 13-15.) An "owner" is defined as a "person who owns something,"[8] and one of the definitions of the verb "own" is "to have power of mastery over."[9] Taking a liberal construction, Bombardier was "project owner" for the project of cleaning the AirTrain station.[10]

In addition, Nunziato in the Underlying Action alleges that the "defendants," one of which was Bombardier, had "ownership" and "control" of the AirTrain Station. (*See* Verified Compl. ¶ 28; Am. Verified Compl. ¶ 33.) These allegations, whether "groundless, false or baseless" are sufficient to trigger a duty to defend. *See Century 21, Inc.*, 442 F.3d at 83.

The second element requires the Court to determine whether North Mountain was performing operations for Capital Cleaning, PANYNJ and Bombardier under contract. The pleadings in the Underlying Action allege that Bombardier was contracted to "provide cleaning and maintenance services" at the AirTrain station. (Verified Compl. ¶¶ 13-15; Am. Verified Compl. ¶ 13-15.) Further, it is undisputed that Bombardier entered into a Services Agreement

---

shall be performed at various locations" and that "[s]uch **premises** are under the exclusive management and control of [North Mountain]." (Potashner PMSJ Decl., Ex. 6, ¶ 12 (emphasis supplied).) Thus, under the terms of the North Mountain Agreement, the "project" and the "premises" are two distinct things, and a "project owner" does not necessarily need to be the owner of the premises.

[8] Owner Definition, Merriam-Webster.com, http://www.merriam-webster.com/dictionary/owner (last visited Dec. 4, 2019).

[9] Own Definition, Merriam-Webster.com, http://www.merriam-webster.com/dictionary/own (last visited Dec. 4, 2019).

[10] This construction of the term "project owner" finds support in other legal contexts. For example, an Alaska insurance statute defined "project owner" as "a person who, in the course of the person's business, engages the service of a contractor for the purpose of working on a construction project." *See State, Dep't of Commerce, Cmty. & Econ. Dev., Div. of Ins. v. Alyeska Pipeline Serv. Co.*, 262 P.3d 593, 594 (Alaska 2011).

with Capital Cleaning (Pl. 56.1 ¶ 12; Def. Counter 56.1 ¶ 12) and that, pursuant to the North Mountain Agreement, Capital Cleaning engaged North Mountain to perform janitorial service/floor maintenance services. (Pl. 56.1 ¶ 14; Def. Counter 56.1 ¶ 14; Def. 56.1 ¶ 4; Pl. Counter 56.1 ¶ 4.) Thus, North Mountain's work plainly was being done under contract.

The third element requires the Court to determine whether the Underlying Action alleges a claim for vicarious liability against Capital Cleaning, PANYNJ and Bombardier. The Underlying Action seeks to hold Capital Cleaning, PANYNJ and Bombardier liable not only for their own acts, but also for the acts of their "servants" and "agents" (*see* Verified Compl. ¶ 30; Am. Verified Compl. ¶ 35), which would include North Mountain employees performing cleaning services at the AirTrain Station. This is the very nature of vicarious liability. *See Meyer v. Holley*, 537 U.S. 280, 285 (2003) ("It is well established that traditional vicarious liability rules ordinarily make principals or employers vicariously liable for acts of their agents or employees in the scope of their authority or employment." (citations omitted)). Thus, the third element is satisfied.

Accordingly, the Court finds that, unless Keystone can establish as a matter of law that the contractual exclusion applies, or that the Keystone Policy is void *ab initio* by reason of North Mountain's misrepresentations, Keystone has a duty to defend Capital Cleaning, PANYNJ and Bombardier in the Underlying Action. The contractual liability exclusion and misrepresentation issues are addressed in connection with Wausau's summary judgment motion. *See* Discussion, Section II, *infra*.

### B.  <u>Priority Of Coverage</u>

Wausau seeks a declaration that insurance coverage under the Kingstone Policy applies on a primary basis before coverage under the Wausau Policy. The Court must look to the "other

insurance" clauses of the Kingstone Policy and the Wausau Policy to apportion coverage between Kingstone and Wausau. *See Sport Rock Int'l, Inc.*, 65 A.D.3d at 18. The "other insurance" clause of the Kingstone Policy states that its coverage is "primary," except in circumstances not applicable here.[11] (*See* Pl. 56.1 ¶ 23; Def. Counter 56.1 ¶ 23.)

The Wausau Policy has two relevant "other insurance" provisions. The provision applicable to named insureds, in this case Capital Cleaning, states that coverage under the Wausau Policy is "excess over: . . . [a]ny other primary insurance available to you covering liability for damages arising out of the premises or operations . . . for which you have been added as an additional insured by attachment of an endorsement." (Pl. 56.1 ¶ 28; Def. Counter 56.1 ¶ 28.) The provision applicable to additional insureds provides that "[t]his insurance shall be excess over any other insurance available to the additional insured, whether such insurance is on an excess, contingent or primary basis, unless [the named insured is] obligated under a written agreement to provide liability insurance for that additional insured on any other basis." (Pl. 56.1 ¶ 29; Def. Counter 56.1 ¶ 29.) The Capital Cleaning Service Agreement does not require that Capital Cleaning provide coverage that is primary or on the same level as its subcontractors.

In sum, taking the terms of the Kingstone Policy and the Wausau Policy together, it is clear that the Kingstone Policy applies on a primary basis before coverage under the Wausau Policy.

---

[11] The Kingstone Policy states that its insurance "is primary except [as] provided under paragraph 7c below, or unless otherwise stated in this policy." (*See* Pl. 56.1 ¶ 23; Def. Counter 56.1 ¶ 23.) Paragraph 7c concerns "fire, extended coverage, builders' risk, installation risk or similar coverage for [the insured's] work;" "fire insurance for premises rented to [the insured];" and "any loss arising out of the maintenance of use of aircraft, autos or watercraft which may be covered by [the] policy" (*see id.*), none of which is relevant here. The Court has been pointed to no other relevant policy provisions encompassed by the "unless otherwise stated in this policy" language.

## II.   **Defendant's Motion For Summary Judgment**

In addition to the arguments asserted by Defendant in opposition to Plaintiff's motion for partial summary judgment, Defendant makes two arguments in support of its motion for summary judgment — *i.e.*, that the contractual liability exclusion of the Kingstone Policy bars coverage and that Kingstone lawfully rescinded the Kingstone Policy based upon a material misrepresentation by its insured, North Mountain. (*See* Def. MSJ Mem. at 11-14.) The contractual liability exclusion and rescission issues are discussed separately.

### A.   **Contractual Liability Exclusion**

Defendant argues Exclusion 2 to the Kingstone Policy excludes coverage here. (Def. MSJ Mem. at 11-12.) Exclusion 2 bars coverage for "[l]iability assumed by the insured under any contract[.]" (Potashner Decl., Ex. 1, at 45.) Defendant takes the position that "the insured" refers only to North Mountain and that since North Mountain assumed liability under the North Mountain Agreement with Capital Cleaning, then Exclusion 2 applies. (*See* Def. Reply at 4-5.) Plaintiff argues that "the insured" refers to the additional insureds seeking coverage, *i.e.*, PANYNJ, Bombardier and Capital Cleaning, and that those insureds are not making claims based upon liability assumed under a contract, such that the exclusion does not apply. (*See* Pl. Opp. Mem. at 19-21.)

The Court agrees with Plaintiff that Exclusion 2 should be considered from the vantage point of "the insured" seeking coverage. Otherwise, the additional insured language of the Kingsbridge Policy would be rendered meaningless.[12] An "additional insured" under the

---

[12] "When construing the terms of an insurance contract, an interpretation that gives a reasonable and effective meaning to all terms of a contract is preferable to one that leaves a portion of the writing useless or inexplicable. . . . Courts must therefore avoid construing conflicting provisions and ambiguities within

Kingsbridge Policy, is defined to include a "person(s) or organization(s) . . . for whom [North Mountain is] contractually obligated to furnish additional insured coverage." (Pl. 56.1 ¶ 22; Def. Counter 56.1 ¶ 22.) North Mountain was contractually obligated to provide additional insured coverage because it obviously was assuming some liability under the contract for which its counterparty (*i.e.*, Capital Cleaning) wanted to have insurance. If Defendant's position were adopted, the contractual exclusion would swallow the additional insured provision. *See Lummus Co. v. Commonwealth Oil Ref. Co.*, 297 F.2d 80, 93 (2d Cir. 1961) (rejecting reading of insurance contract "that would allow an exception, ineptly worded to meet a particular problem, to swallow the rule").

In any event, the Court finds that there is no clear and unmistakable language in Exclusion 2 that excludes coverage for the additional insureds here. *See Seaboard Sur. Co.*, 64 N.Y.2d at 311. Further, the Court finds that Defendant has failed to meet its "heavy burden of demonstrating that the allegations of the complaint cast the pleadings wholly within [the contractual liability] exclusion, that the exclusion is subject to no other reasonable interpretation, and that there is no possible factual or legal basis upon which the insurer may eventually be held obligated to indemnify the insured under any policy provision." *See Frontier Insulation Contractors*, 91 N.Y.2d at 175.

**B.   Rescission Of Kingstone Policy Due To Misrepresentation**

Defendant also seeks summary judgment on the ground that it "lawfully rescinded" the Kingstone Policy. (*See* Def. MSJ Mem. at 12 ("POINT III: KINGSTONE LAWFULLY RESCINDED THE

---

a policy in such a manner as to negate certain coverages, or in ways that render coverage provisions mere surplusage." *United States Underwriters Ins. Co. v. Affordable Hous. Found., Inc.*, 256 F. Supp. 2d 176, 181 (S.D.N.Y. 2003) (citations omitted).

KINGTONE POLICY BASED ON A MATERIAL MISREPRESENTATIONS BY ITS NAMED INSURED").)

However, according to Kingstone's own 56.1 Statement, "Kingstone has not rescinded the

Kingstone policy." (*See* Def. 56.1 ¶ 7; *see also* Pl. Counter 56.1 ¶ 7.) (*See* Def. Opp. Mem. at 13

("Kingstone did not rescind the Kingstone policy because it had already been cancelled on May

26, 2015, prior to the date of the loss.").)

In any event, the Court finds that Defendant has not met its burden to establish its

entitlement to summary judgment based on material misrepresentations by North Mountain in

the application for the Kingstone Policy. Defendant asserts that "North Mountain made

fraudulent misrepresentations in its [insurance] application" regarding the number of North

Mountain employees and that Defendant "would not have issued the Kingstone [P]olicy if it had

known the truth of North Mountain's large business operations engaging 25 full-time employees

working three 24 hour shifts at the JFK International Airport." (Def. MSJ Mem. at 13.) However,

Defendant has failed to submit, as required by Local Civil Rule 56.1, a statement containing the

facts supporting its misrepresentation defense, which would have given Plaintiff the opportunity

to dispute such facts.[13] Thus, the Court finds that Defendant has not met its burden of

demonstrating the absence of a disputed issue of material fact. *See Celotex Corp.*, 477 U.S. at

321-23.

Notably, Defendant has failed to submit adequate proof (and certainly not proof to

establish as a matter of law) that North Mountain made material misrepresentations "at or

---

[13] Local Civil Rule 56.1(a) provides: "Upon any motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, there shall be annexed to the notice of motion a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried. Failure to submit such a statement may constitute grounds for denial of the motion."

before the making of the insurance contract." *Kreitzer & Vogelman*, 2000 WL 16949, at *6. No affidavits or other testimony were offered by Defendant from North Mountain or its insurance agent regarding representations made by North Mountain in (and prior to) North Mountain's insurance application.[14] Moreover, the unsworn document from Mueller Insurance Services, dated April 17, 2014, which recounted statements made by North Mountain (McCauley MSJ Decl., Ex. P), came after the making of the insurance contract, since the Kingstone Policy was issued on March 27, 2014 (Potashner PMSJ Decl., Ex. 1), the day after the insurance application was submitted by North Mountain. (*See* McCauley MSJ Decl., Ex. Q.) Thus, Defendant has not established an entitlement to summary judgment based upon alleged misrepresentations by North Mountain in the insurance application.

I therefore find that Wausau is entitled to a declaration that Kingstone owes a duty to defend in the Underlying Action[15] and that Kingstone's insurance coverage applies on a primary basis before coverage under Wausau's Policy.

---

[14] On the other hand, Plaintiff in opposing Defendant's misrepresentation defense offered the deposition testimony of one of Defendant's 30(b)(6) witnesses, Lobosco, who testified that Kingstone did not investigate whether the information in the North Mountain insurance application was accurate as of the date it was submitted. (*See* Potashner PMSJ Decl., Ex. 13, at 38, 51, 66-67, 83-86.)

[15] Kingstone is not relieved of paying for the defense in the Underlying Action unless and until it is determined with certainty that no defense is owed under the Kingstone Policy due to the alleged misrepresentations made by North Mountain. *See Century 21, Inc. v. Diamond State Ins. Co.*, 442 F.3d 79, 84 (2d Cir. 2006). Normally, where an insurer is relieved of the duty to defend by a judicial determination that, despite allegations of the underlying complaint bringing it within the policy's coverage, there is no duty to defend, the insurer nonetheless is liable for the defense costs incurred in the underlying action up until the time of the judicial determination. *See Burroughs Wellcome Co. v. Commercial Union Ins. Co.*, 632 F. Supp. 1213, 1220 (S.D.N.Y. 1986).

## CONCLUSION

For the foregoing reasons, I respectfully recommend that Plaintiff's motion for partial summary judgment be GRANTED and that Defendant's motion for summary judgment be DENIED.

DATED:       December 4, 2019
              New York, New York

_____
STEWART D. AARON
United States Magistrate Judge

                    *               *               *

**NOTICE OF PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION**

The parties shall have fourteen (14) days (including weekends and holidays) from service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. *See also* Fed. R. Civ. P. 6(a), (d) (adding three additional days when service is made under Fed. R. Civ. P. 5(b)(2)(C), (D) or (F)). A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections, and any response to objections, shall be filed with the Clerk of the Court. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Batts.

**FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.** *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); *Thomas v. Arn,* 474 U.S. 140 (1985).